**UNITED STATES of America, Plaintiff,**

v.

**Marshall G. SOLOMON, Jr. and Deborah J. Carter, Defendants.**

**No. 89–8028–CR–JAG.**

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Jan. 18, 1990.

Marc Fagelson, Asst. U.S. Atty., Office of U.S. Atty., Fort Lauderdale, Fla., for plaintiff.

Jeffrey Kay, Fort Lauderdale, Fla., for Deborah J. Carter.

Paul Lazarus, Miami, Fla., for Marshall Solomon, Jr.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the court upon the motions to suppress evidence and statements filed by the defendants, Marshall Solomon, Jr. (Solomon) and Deborah Carter (Carter).

These motions were referred to the Honorable Ann Vitunac, United States Magistrate, by this court's orders dated June 2, 1989 and June 27, 1989. After conducting an evidentiary hearing, the Magistrate filed her Report and Recommendation on No-vember 8, 1989 and suggested to this court that the defendants' motions to suppress be granted. The United States has appealed the Report and the defendants have filed opposing memoranda.

This case represents another skirmish in this country's "war" against illegal drugs. On April 7, 1989, the Broward County Sheriff's office received an anonymous message on its telephone "tips" line. The tipster gave the following facts. George Solomon, a white male, about six feet tall, 160 pounds and who resided at 2831 Northeast 32nd Avenue in Fort Lauderdale, was involved in cocaine transactions. He was allegedly transporting cocaine to North Carolina and Georgia.

The message also relayed information about Solomon's future acts. According to the tipster, on the following day, Solomon would leave his residence between six and nine o'clock in the morning. He would be carrying cocaine in his vehicle with the intention of transporting it in a maroon, Chevrolet El Camino. His route would be northward; possibly either to Interstate 95, then to Route 110, or westward to Interstate 75, then north.

The tipster also stated that there would be a white female traveling with Solomon. This woman was described as a white female, with blonde hair, about five-feet, four inches tall, twenty-five years old, and named Debbie.

It was also disclosed that there was a large sail boat behind Solomon's residence and that he had a warehouse away from the residence where he kept cocaine.

Acting with less than one days notice before the trip, the police investigated the tip. They discovered several facts which corroborated some of the information. The officers found a maroon, Chevrolet El Camino registered to Solomon at the address given. There was also a sail boat registered to Solomon behind his residence bearing either a North Carolina or Florida license tag.

At approximately six o'clock the next morning, April 8, the police officers observed a white male meeting Solomon's de-

scription get into the El Camino. A white female matching the description of the tip's Debbie then exited apartment 102. She joined the man in the car. The police then followed the vehicle as it proceeded westward on Commercial Boulevard. After stopping at an Amoco station, the El Camino turned onto the Florida Turnpike and headed north.

Two police units followed the car, but had difficulty maintaining surveillance because of the early morning darkness and the presence of significant fog. There is no evidence that the El Camino was ever evasive or that its driver committed any traffic offenses. The police officers following the car did not have direct radio communication car-to-car and had to speak to each other indirectly via a base station.

The agents called for assistance and a Palm Beach County officer joined the pursuit. Thereafter, the three police officers surrounded the car, displayed their flashing blue lights, used their sirens, and forced the El Camino to stop. The police, yelling at the occupants of the car, forced Solomon and Carter to exit their vehicle and lie on the ground. They were then handcuffed and placed in separate police cars. Carter was uncuffed within a few minutes, but the officers did not release Solomon. A police helicopter was over the scene and hovered there.

Within three minutes of the initial stop, the police asked Solomon and Carter for consent to search the vehicle. Both individuals verbally agreed. Solomon later refused on two different occasions to sign a written consent form. Neither defendant was told that they had the right to withhold consent.

After obtaining the verbal consent, the police searched the vehicle, the tarp covered bed of the El Camino, and the defendants' luggage. They discovered five kilograms of cocaine in a factory-built compartment underneath or behind the car's seat. Solomon was later searched at the scene and the police found a slip of paper on his person supposedly evidencing drug transactions (the "drug paper").

Solomon made no statements to the police other than his consent to the search. Carter did make several possibly incriminating statements at the Turnpike stop. She also made several statements later at the police station including telling the officers that she had helped Solomon package the cocaine at the apartment building where the two resided. However, these statements were made after she had requested to speak to an attorney. The government concedes that these statements at the station were illegally obtained, and should be excluded. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). There is no evidence that Carter initiated the station house discussions herself.

After the arrest of the defendants, the police officers applied to the Honorable Ann Vitunac, U.S. Magistrate, for a search warrant for Solomon's residence. The probable cause affidavit submitted by Special Agent David Taylor of the Drug Enforcement Administration did not contain details of the vehicle seizure, but merely stated that the car had been "stopped". Moreover, the affidavit merely states that the defendants "gave a verbal consent to search the car." The agent also testified as to the presence of the cocaine in the car and the illegally obtained statement by Carter that cocaine was packaged in Solomon's residence.

Based upon this information from the anonymous tip, the evidence seized at the Turnpike stop, and Carter's statements, Magistrate Vitunac issued a search warrant for 2841 Northeast 33rd Court, Apartment 102, Fort Lauderdale, Florida. The officers subsequently went to that location and discovered guns, packing materials, drug paraphernalia, maps, a beeper, and various papers including documents and a key indicating the location of a warehouse, alluded to by the tipster.

Based upon all the information contained in the first affidavit, Agent Taylor applied to Magistrate Vitunac and was granted a second search warrant for the warehouse. Upon execution, the police discovered 500

grams of cocaine, packing materials, scales, and more documents.

Both defendants move to suppress all the statements and evidence discovered by the police. They contend that the stop of the El Camino was illegal in that there was no probable cause, and that the search of the vehicle was conducted without legal consent. Because the search warrants were based upon the evidence from the traffic stop including the illegally obtained, station house statements of Carter, the defendants move to suppress all the evidence seized at Solomon's residence and warehouse pursuant to the fruit of the poisonous tree doctrine.

The United States concedes that this was an arrest, but contends that there was probable cause. Moreover, even if the arrest was invalid, the government argues that the defendants consent was legal and constitutes an intervening act sufficient to avoid application of the exclusionary rule. Finally, if the arrest and consent were both invalid, it is suggested that the officers act of securing the search warrants and their good faith remove the taint on the evidence discovered at the home and warehouse.

■ The initial issue is whether the stop of the defendants' car was an arrest or merely a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The car stop here was undoubtedly a seizure under the Fourth Amendment. Moreover, the facts of this case do not fit within the limited scope of a *Terry* stop. At no time were the defendants in this case free to walk away. Furthermore, the manner of the stop carried all the indicia of a custodial arrest. The defendants' vehicle was surrounded by three officers and forced off the road. Carter and Solomon were then required to exit the car and lie on the grounds while facing three drawn and aimed guns. They were then handcuffed and detained in the police cars. The government cannot seriously contend such circumstances do not constitute an arrest under the Fourth Amendment.

■ Our Constitution requires that all arrests, where there is no warrant, be based upon probable cause to believe that a crime occurred and that these defendants committed it. The facts known to the officers at the time of the stop from the anonymous tip plus their investigation and surveillance of the defendants would not demonstrate probable cause to any reasonable law enforcement officer. In fact, there is considerable doubt that there was even reasonable suspicion sufficient to justify a *Terry* stop.

The United States relies upon the case of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), as a "ringing endorsement of the use of anonymous tips in law enforcement." *See* Government's Objections at 4. The government also contends that it corroborated the tip as much as possible given the fact that there were only hours between the time the tip was received and the alleged courier trip northward by the defendants.

True, the police officers did corroborate many of the innocent facts in the tip. Moreover, the tipster could be assumed to have some basis for his knowledge given his correct prediction of the defendants' future actions. However, there was no corroboration or independent observation of any criminal or even suspicious actions by Solomon and Carter. This court is presented with a situation where some unknown person or persons made certain allegations against two other citizens. The police corroborated the details of the anonymous tipster(s) and then effected a felony stop of the two defendants who did nothing more than get into a vehicle and drive.

The government is correct to focus on *Gates* as the pivotal case on the issue of probable cause. There, the police received an anonymous letter. It gave the following information about the defendant Gates: his first and last name; his street address; his alleged purchase of illegal drugs in Florida; his modus operandi of having his wife drive their car to Florida while he flew down and then drove the car back with the wife flying home on the return trip; May 3 as the next scheduled trip; the Gates had

**1548**

drugs in their car and home; they bragged about not working and making money from pushers; and they had friends visiting their residence who were known drug dealers.

The *Gates* police corroborated the anonymous letter. They observed that Lance Gates had a driver's license listing his address at the location relayed in the tip. They also confirmed that Lance had flight reservations to West Palm Beach, Florida on May 5 and that he actually flew down on that day. He was then observed in West Palm Beach going to a hotel room registered in the name of Susan Gates. On May 6, Lance and an unidentified woman left the hotel together in a car with Illinois license plates, the state where the Gates resided. The car was registered to Gates and the two traveled northward on Interstate 95 to Illinois where the Gates were arrested. Lance's round trip took only thirty-six hours.

In deciding the weight to be given to an informant's information in calculating probable cause, the Supreme Court in *Gates* modified *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), by declining to require proof of both an informant's reliability and the basis for his information. The issue now is whether, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place or on a specific individual. *Gates*, 462 U.S. at 238, 246, 103 S.Ct. at 2332, 2336. While a court should consider the *Aguilar* factors, the inquiry is whether all the circumstances, including the observed facts and considerations of human behavior, reasonably demonstrate to the police that the defendants probably committed a crime.

The Supreme Court also noted that anonymous tips, without more, cannot constitute probable cause. However, police corroboration may redeem the tipster's unknown reliability and make up for a weak showing on the basis for his knowledge. Where police officers can only corroborate innocent facts of a tip, there can be no probable cause *unless* the innocent facts are, of themselves, suspicious. *Gates*, 462 U.S. at 257 n. 13, 103 S.Ct. at 2342 n. 13.

In *Gates*, the Court was swayed by Florida's unfortunate reputation as both a drug source as well as a vacation mecca. Moreover, the fact that Lance only spent thirty-six hours on the whole trip was suspicious enough to support a probability that the trip was a prearranged drug buy, rather than a short weekend excursion.

The Court also noted that particularily detailed tips require less corroboration since they correctly predict unpredictable human behavior. To the extent that the informant's predictions are proven out by police observation, law enforcement officers can safely assume that the informant has a solid foundation for his tip.

Applying *Gates* to the case at bar, the police only corroborated the innocent activity of a couple who lived at a certain address, owned certain personalty, and who happened to take an early morning trip northward. Unlike the short trip to another state in *Gates*, a trip northward on the Florida Turnpike is not suspicious. Unlike Gates, Carter and Solomon reside in Florida. Their trip was as readily explainable as a pleasure excursion as a drug run.

Simply put, when the police arrested the defendants on that Saturday morning, they had no reasonable basis for believing Carter or Solomon were transporting illegal drugs.

The arrest of the defendants was, therefore, illegal. The cocaine found in the El Camino, any incriminating statements made by either defendant, and the alleged drug paper found on Solomon's person must all be excluded as fruit of the illegal arrest.

The United States attempts to avoid this result by arguing that the defendants' consent to the vehicle search was an intervening act that purged the taint of the illegal arrest. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (application of the purged taint exception to the rule of exclusion of fruit of the poisonous tree); *Cf. Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (illegally obtained confession fol-

lowed by second, valid confession is presumptively voluntary).

There is a major weakness in the government's position. The Magistrate has found that the defendant's verbal consent here was *involuntary*.

■ Because of the ambiguity in the Magistrate's Report dated November 8, this court remanded the case to the Honorable Ann Vitunac for clarification by order dated December 29, 1989. By her order of the same date, Magistrate Vitunac found that the defendants did in fact consent to a search of the vehicle and its contents. However, the order of clarification also found that this alleged consent "was not free and voluntary, in that it was the product of the illegal arrest and the show of force within three minutes prior to that 'consent'."

This court believes that the Magistrate's determination on the issue of consent, whether evaluated under the clearly erroneous or *de novo* standards of review, is correct.

Carter and Solomon were run off the road and their vehicle forcibly stopped. They were yelled at, forced to exit the car, and lie on the ground, while facing pointed guns. They were then handcuffed and placed in the back of police vehicles. As a helicopter hovered overhead and the excitement from the stop had not even begun to dissipate, the defendants were asked to consent to a search of their vehicle. Solomon was still handcuffed. In the face of such an overwhelming show of force, any citizen would consent to a search. Further, the police never attempted to advise either defendant that they had the right to refuse consent. While such advise is not required, the defendant's choice is required to be intelligent, free and voluntary.

After the car stop, the police officers obtained two search warrants for Solomon's residence and warehouse. The next inquiry must, therefore, be whether the evidence discovered during these two searches was also tainted by the illegal arrest, and therefore rendered excludible.

■ The first warrant for the residential search was based upon the anonymous tip, the police officers' corroboration, the illegally obtained statements from Carter, and the evidence obtained by the car stop. As established above, the tip and the officers' corroboration do not establish probable cause. The other grounds in the probable cause affidavit, the cocaine and drug paper recovered at the traffic stop and the statements of Carter, have already been determined to be excludible. Therefore, there could have been no probable cause for the issuance of the warrant.

The second warrant for the warehouse is dependent upon the legality of the residential warrant. But for the illegal search of Solomon's home, the police would not have discovered the documents and the marked key leading them to the warehouse.

It follows, therefore, that the evidence seized in these two searches is likewise tainted as fruit of the illegal arrest.

■ The United States rallies behind the good faith exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 to resurrect its case. There, the Supreme Court found that police officers who reasonably rely upon a facially valid warrant, even though later determined to have been without probable cause, are not barred from admitting evidence seized in the authorized search.

The police in the case at bar did not just go out and search Solomon's residence. They first went to the Magistrate. *Leon* encourages the police to seek out a judicial officer prior to acting by giving limited deference to the magistrate's determination that there is probable cause.

However, the good faith exception does not apply here. The probable cause affidavit submitted by Agent Taylor omitted the material details of how the evidence was obtained. It merely stated that the El Camino had been "stopped" without presenting the magistrate with the circumstances of the arrest. Moreover, Taylor relied upon illegally obtained statements made by Carter after she had requested an attorney. As noted, no reasonable officer,

**1550**

when confronted with the facts of the tip, plus the limited amount of corroboration, could have concluded that there was probable cause for a full blown arrest. Moreover, to excuse the officer's material omissions here would encourage the police to be less than candid in applying for warrants. It is not surprising that Magistrate Vitunac reversed herself in this case by invalidating the very warrants that she issued after she was presented with all the facts surrounding the arrest. Further, as to the station house statements of Carter, it is clearly established in the law that when a defendant requests the presence of counsel, the police may not continue their interrogation. To not require an officer to follow this simple and well established constitutional law would emasculate the Supreme Court's bright line ruling in *Edwards v. Arizona.*

The government lastly relies upon the policy argument that exclusion of the evidence would undermine law enforcement's need to rely upon informants. The court certainly acknowledges that informants, including anonymous tipsters, are often necessary. Quite true. This court's ruling does not discourage reliance upon informants. It merely requires the police to do their job. To make a felony arrest with guns based merely upon unsubstantiated rumor provided by an unknown caller cannot be condoned. This is true even though when, as here, the police, such as here, have only a limited time to investigate an informant's tip. Absent exigent circumstances, the officers should complete their investigations rather than risk violation of the Constitution even if regretably means losing a particular arrest opportunity.

Indeed, had the police officers herein done their homework, the compelling evidence discovered and seized here would have been admissible. As noted by the Magistrate, the police did not even check to see whether Solomon or Carter had a criminal record. In fact, Solomon was a convicted felon. He was also recorded on the "Naddis" computer as a suspected drug smuggler. Knowledge of Solomon's prior criminal activity along with the corroborated information and the tip could have supplied a reasonable basis for his arrest.

In addition, the officers' seizure of the car could have been better planned. They could have executed a less intrusive stop so as to fall within the *Terry* exception, and thereby only required to show reasonable suspicion. Or, assuming reasonable suspicion, the officers could have used a dog trained to detect drugs to search the automobile, thereby possibly eliminating the need to obtain the defendants' consent. *See Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop is a seizure, but reasonable search allowed); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (may search automobile if reasonable believe occupant(s) are dangerous and armed); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

■ Finally, the government requests that this court hold a *de novo* hearing on the motions. Such relief is not warranted. The motions were properly referred to the Magistrate for a recommended disposition. To conduct another hearing to consider the same evidence already heard by the Magistrate would undermine judicial economy. Moreover, the motion to suppress is a non-dispositive matter requiring less than *de novo* review under Magistrate Rule 4(a)(1) of this court's Local Rules. Under this section, this court shall review the Magistrate's factual findings under the clearly erroneous standard, but shall consider the law and the application of the law to these facts *de novo.* Finally, the government's appeal is primarily based upon the Magistrate's application of the law to the facts, not upon her determinations of credibility and resolution of factual disputes. Indeed, the only possible factual dispute is as to the issue of consent; however, even this is not a true factual controversy. There is no issue that the defendants did verbally tell the police officers at the Turnpike stop that they could search the vehicle. There is also no debate over the facts which each party relies upon to argue that the consent was involuntarily obtained. For example, the parties agree that the police surrounded the defendants' vehicle, displayed their guns, handcuffed the defendants, and

placed them in separate vehicles. Simply put, even if there was a rehearing of the evidence, this court would make the same factual findings as made by the Magistrate.

Having considered the above matters, and the record in this cause, it is hereby

ORDERED AND ADJUDGED that the motions to suppress evidence and statements filed by the defendants Carter and Solomon are GRANTED. Regretably, the arrest of the defendants was made without probable cause in violation of the Fourth Amendment. The cocaine and drug paper seized at the car stop, all statements made by Carter at the car and at the station house, and the evidence seized at the defendant Solomon's home and the warehouse are hereby SUPPRESSED pursuant to the exclusionary rule, and shall be deemed INADMISSIBLE for purposes of the prosecution's case-in-chief at trial. The evidence and statements are tainted fruit of the illegal arrest.

The motion by the United States for a *de novo* hearing of the motions to suppress is DENIED.

For purposes of setting this case for trial, the government is hereby DIRECTED to file a Notice with this court within ten calendar days indicating its intention to try the case, appeal this order, or move for dismissal of this prosecution. The government may file its notice under seal if so required.

The Clerk of the Court is DIRECTED to file the two files submitted by Magistrate Vitunac pursuant to this court's order dated December 29, 1989 as EXHIBITS to this order.

DONE AND ORDERED.