UNITED STATES of America,
Plaintiff,

v.

Shawn Phillip GRANT and Ronald
Earl Ingram, Defendants.

No. CRIM.A.02–69–1 & 3 JJF.

United States District Court,
D. Delaware.

April 11, 2003.

Colm F. Connolly, Esquire, United States Attorney, and Anne Y. Park, Esquire, Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, for Plaintiff.

John P. Deckers, Esquire of John P. Deckers, Esquire, Wilmington, for Defendant Shawn Phillip Grant.

Penny Marshall, Esquire, Federal Public Defender, Federal Public Defender's Office, Wilmington, for Defendant Ronald Earl Ingram.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court are Defendant Shawn Phillip Grant's Motion to Suppress Evidence (D.I.41–1)[1] and Motion to Disclose Information Regarding the Confidential Informant (D.I.43).[2] Also before the Court are Defendant Ronald Earl Ingram's Motions to Suppress Evidence (D.I.45, 46) and Motion to Disclose Information Regarding the Confidential Informant (D.I.47). For the reasons discussed below, the Motions to Suppress (D.I.41–I, 45, 46) and the Motions to Disclose (D.I.43, 47) will be granted in part and denied in part.

## INTRODUCTION

Messrs. Ingram and Grant have been charged with one count each of possession of heroin and cocaine with intent to distribute them, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; possession of marijuana with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; conspiracy to possess heroin, cocaine, and marijuana with the intent to distribute them, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); possession of a firearm after conviction of a felony, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 2; possession of a semi-automatic assault weapon, in violation of 18 U.S.C. §§ 922(v)(1) and 924(a)(1); and using and carrying a firearm during and in relation to a drug trafficking crime and possessing the firearm in furtherance of the drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. Messrs. Ingram and Grant move, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, to suppress any evidence or statements directly or indirectly derived from the May 21, 2002, stop and search of an automobile

---

1. D.I. 41 is entitled "Pre-trial Motions of Defendant Grant," and it includes three motions: 1. Motion to Suppress Evidence; 2. Motion Pursuant to Federal Rule of Criminal Procedure 12(d)(2); and 3. Motion Pursuant to Federal Criminal Procedure 26.2. Defendant Grant, in his Motion Pursuant to Federal Rule of Criminal Procedure 12(d)(2), seeks to have a time deadline set for the Government to provide to the defense all materials the Government plans to use in its case-in-chief at trial. As the Government points out in its response (D.I.54), Rule 16 contains no such deadline, and Defendant Grant has made no showing under Rule 16(d)(1) that would cause the Court to modify discovery in this case. Furthermore, the Court notes that the Government has a continuing obligation to disclose requested information under Rule 16(c), and Defendant Grant has made no showing

that the Government is not complying in good faith with this obligation. For these reasons, the Court will deny Defendant Grant's Motion (D.I.41–2). Additionally, because Defendant Grant's Motion Pursuant to Federal Criminal Procedure 26.2 relates only to the Government's production of witness statements prior to the now-completed November 4, 2002, suppression hearing, the Motion (D.I.41–3) will be denied as moot.

2. Also pending is Defendant Grant's Motion To Strike Portion of Testimony From Evidentiary Hearing (D.I.73). Defendant Grant is represented by counsel, yet Mr. Grant filed the Motion pro se. Accordingly, the Court will deny the Motion (D.I.73) with leave to renew.

occupied by Defendants. Messrs. Ingram and Grant also move, pursuant *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), to have the Government disclose the identity and whereabouts of the confidential informant ("CI") who provided the information leading to the stop and search.

The Court held an evidentiary hearing on the Motions on November 4, 2002, and ordered the parties to submit proposed findings of fact and conclusions of law. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law regarding the Motions to Suppress and to Disclose Information Regarding the Confidential Informant.

### FINDINGS OF FACT

1. The CI is a probationer that has been under intensive supervision by Probation Officer William Craig Watson since March 2002 for violation of probation on a burglary conviction. Tr. 4, 22.[3] While on Officer Watson's caseload, the CI was re-arrested on April 17, 2002, and charged with various drug offenses.[4] Tr. 4. On April 18, 2002, the CI contacted Officer Watson to inform him of the arrest, and, at a subsequent meeting, the CI asked Officer Watson if there was anything he could do to help himself out in regard to the new charges. Tr. 5.

2. Officer Watson informed the CI that he was not in a position to help him; however, Officer Watson told the CI that he could put him in touch with police officers who might be able to help him. Tr. 5. In order to demonstrate his credibility, the CI offered to provide Officer Watson with information regarding Officer Watson's other probationers, and to facilitate the transmission of information, Officer Watson gave the CI his cell phone number. Tr. 6.

3. Between April 17, 2002, and May 21, 2002, the CI provided Officer Watson with information regarding two probationers on Officer Watson's caseload ("P–1" and "P–2"). Tr. 6. The CI told Officer Watson that P–1, who was on probation for drug charges, was dealing drugs in a specific geographic area from a yellow and orange Canondale mountain bicycle. Tr. 7. Two other probationers relayed similar information regarding P–1 to Officer Watson, although they were not as specific about the details of the bicycle. Tr. 49. Subsequently, on a routine field visit, Officer Watson saw P–1 riding a yellow and orange Canondale bicycle in the area specified by the CI. Tr. 7. The CI told Officer Watson that P–2 was selling drugs in a specific location that was not close to P–2's residence. Tr. 7. Two other probationers on Officer Watson's caseload told him that P–2 was selling drugs at the location specified by the CI. Tr. 51. Additionally, one of those probationers told Officer Watson that she purchased drugs from P–2 at the location specified by the CI. Tr. 51. Subsequently, Officer Watson stopped P–2 at the location specified by the CI, searched him or her, and found no controlled substances on his or her person. Tr. 7.

4. In consideration for providing Officer Watson with the information concerning P–1 and P–2, the CI was allowed to remain out on bond to work with the police. Tr. 8. Essentially, Officer Watson did not violate the CI's parole status for the

3. Tr. refers to the transcript of the November 4, 2002, suppression hearing (D.I.61).

4. The Court recently received Defendant Ingram's Addendum to *Roviaro* Motion (D.I.75), which notes that the CI, Victor Johnson, was arrested on February 9, 2003, for drug offenses, resisting arrest, and second degree criminal trespass.

April 17, 2002, arrest because of the CI's cooperation. Tr. 8.

5. Between April 17, 2002, and May 21, 2002, the CI informed Officer Watson that individuals the CI had been incarcerated with in South Carolina had contacted him about coming to Delaware to sell drugs and rob other drug dealers. Tr. 9.

6. On May 14, 2002, the CI was administered a urine screen, and a May 17, 2002, laboratory report indicated the CI had marijuana, cocaine, and opiates in his system. Tr. 21.

7. On May 21, 2002, at approximately 5:30 p.m., the CI called Officer Watson on his cell phone. Tr. 8. The CI told Officer Watson that the individuals he had been incarcerated with in South Carolina had come down from New York and picked him up at his residence; that they were in Middletown, Delaware attempting to locate a scale; and that there were drugs and a gun in the car. Tr. 8–9. Officer Watson testified that the CI sounded afraid and anxious during this conversation and that the CI's voice was cracking. Tr. 9. After receiving the CI's 5:30 p.m. telephone call, Officer Watson telephoned Detective Mike Rodriguez of the Vice Unit of Wilmington Police Department ("WPD") and relayed to him the information Officer Watson had learned from the CI. Tr. 10.

8. On May 21, 2002, at approximately 6:30 p.m., the CI again called Officer Watson on his cell phone. Tr. 10. During this call, the CI told Officer Watson that the CI and three other individuals were on their way back from Middletown and were heading to an apartment complex in New Castle on DuPont Highway (Route 40 and/or U.S. 13). Tr. 11. Additionally, the CI stated that one of the individuals had put a gun in the CI's mouth and told him that if they got to Wilmington and the CI did not have the money, they would kill the CI and his family. Tr. 11. The CI also informed Officer Watson that there was a loaded MAC–10 firearm in the cab of the car and that there were drugs in the trunk. Tr. 11–12.

9. Officer Watson testified that the CI sounded like he was under more stress during the second telephone conversation then the first; the CI's voice was cracking and his speech was rapid. Tr. 11. After receiving the CI's 6:30 p.m. telephone call, Officer Watson called Detective Rodriguez of the WPD, who informed Officer Watson that he could not respond after 7:00 p.m. because they had no authorization for overtime. Tr. 12. Thus, Officer Watson also called Probation and Parole Supervisor Pat Cronin of the Governor's Task Force and relayed what Officer Watson had learned thus far from the CI. Tr. 12.

10. On May 21, 2002, at approximately 7:30 p.m., the CI called Officer Watson on his cell phone for the third time. Tr. 13. The CI was crying and sobbing during the conversation, but Officer Watson was able to elicit that the CI and the three other occupants of the vehicle were at the Du-Pont Parkway Apartments visiting a female. Tr. 13. The CI relayed that they were in a reddish or maroon Saturn with tinted windows and South Carolina license plates. Tr. 13. The CI specified that there was cocaine and heroin in the trunk of the Saturn. Tr. 13. The CI told Officer Watson that they were leaving shortly and begged him to have the car stopped because if they made it to North Wilmington, his life and the lives of his family would be. in jeopardy. Tr. 13. Once off the phone with the CI, Officer Watson relayed the above information to Supervisor Cronin. Tr. 14.

11. Officer Watson made no notes of his conversations with the CI and took no part in the arrest of Defendants. Tr. 14–15.

12. At approximately 7:45 p.m., Supervisor Cronin contacted Detective ("Det.") Robert Jones of the Governor's Task Force ("GTF") and informed him that there were three or four individuals at the DuPont Parkway Apartments with narcotics and a large automatic weapon and that the individuals were traveling in a maroon Saturn with North or South Carolina tags. Tr. 64.

13. Det. Jones immediately began to alert and assemble the members of the GTF. Tr. 65. At around the same time, Det. Jones was contacted by Det. Clemons of the Delaware State Police, who was en route to the DuPont Parkway Apartments because he had received similar information about the same vehicle. Tr. 65–66.

14. Det. Jones, who was driving an unmarked blue Crown Victoria, took up a position three or four tenths of a mile north of the DuPont Parkway Apartments on Route 40/U.S. 13, while Det. Clemons, who was driving an undercover vehicle, entered the parking lot of the DuPont Parkway Apartments to attempt to locate the maroon Saturn. Tr. 66–67. After spotting the Saturn, Det. Clemons returned to the entrance and parked where he could observe the only exit from the apartment complex. Tr. 67. Det. Jones then called the State Police Communications Center to get a helicopter in the air to assist the officers on the ground. Tr. 67. While the above events were unfolding, the GTF learned by radio that there was a loaded MAC–10 in the car and that the three or four individuals were traveling to Wilmington to rob drug dealers. Tr. 68.

15. Approximately ten minutes after Det. Clemons first sighted the Saturn in the parking lot of the DuPont Parkway Apartments, the Saturn exited the parking lot. Tr. 68. Around the same time, Det. Meadows of the GTF, who was driving a green Pontiac Grand Am, arrived and picked up Det. Clemons, who did not want to use his undercover car. Tr. 68. Det. Meadows followed the Saturn as it headed north on U.S. 13 to Wilmington. Tr. 68.

16. Once the Saturn was on U.S. 13, Officer Lewis of the GTF, driving a tan Ford Taurus, joined Det. Meadows in following the Saturn. Tr. 69. As the procession passed Det. Jones, who was parked on U.S. 13 north of the apartments, he pulled out and fell in behind the procession. Tr. 69. At some point, Supervisor Cronin, driving a blue Ford Taurus, also joined the officers in tailing the Saturn. Tr. 69. In total, there were four police vehicles following the Saturn as it headed north on U.S. 13. While following the Saturn, the officers noticed that it made several lane changes without signaling and followed another vehicle too closely. Tr. 71.

17. The officers planned on blocking the Saturn in with their vehicles at a red light on U.S. 13. Tr. 70. The officers caught green lights for several miles until they came to the light at U.S. 13 and Memorial Drive. Tr. 70. At the red light at Memorial Drive, Officer Lewis, who was in front of the Saturn, stopped. Tr. 70. The Saturn stopped as well. Tr. 70. At that point, Officer Lewis backed up slightly; Supervisor Cronin pulled up on one side; Det. Meadows pulled up on the other; and Det. Jones pulled up behind, boxing the Saturn in. Tr. 70.

18. Just before the officers executed the stop, Det. Clemons observed movement by the occupant in the front passenger seat which Det. Clemons believed was an attempt to shove something under the seat. Tr. 72.

19. Once the Saturn was boxed in, the officers identified themselves by yelling "State Police, let me see your hands" and began removing the four occupants from the car. Tr. 70. The officers were all in

civilian clothes, but at least three were wearing tactical vests with "State Police" or "Probation and Parole" emblazoned on the front and back. Tr. 71. The stop occurred at approximately 8:23 p.m. Tr. 75.

20. Defendant Ronald Earl Ingram was removed from the driver's seat of the Saturn. Tr. 73. Defendant Monroe Foster was removed from the front passenger seat, and Defendant Shawn Phillip Grant was removed from the rear seat behind the passenger. Tr. 73–74. The CI was in the rear seat behind the driver. Tr. 74. Once removed from the car, the Defendants were handcuffed. Tr. 74.

21. At approximately 8:31 p.m., Det. Clemons discovered a bag in the front passenger seat with the butt of a weapon sticking out of it. Tr. 75. The bag contained a loaded MAC–11 semiautomatic firearm and five rounds of loose ammunition. Tr. 75.

22. When the officers stopped the Saturn, several marked police cars also stopped all northbound traffic on U.S. 13 for safety reasons. Tr. 71. Several New Castle County Police Officers, including a canine officer with a drug-certified dog, arrived at the scene shortly after the stop. Tr. 76. After pulling the Saturn off the highway and into a parking lot, the officers had the dog check the car for drugs, and the dog alerted to the trunk and the back seat. Tr. 76–77.

23. Upon searching the trunk at approximately 8:39 p.m., the officers recovered 37.1 grams of cocaine, 9.8 grams of heroin, and miscellaneous drug paraphernalia. Tr. 77–78. At approximately 9:07 p.m., the officers discovered a black jacket in the middle of the back seat of the car that contained eleven (11) bags of marijuana. Tr. 76. Additionally, the officers discovered one (1) bag of marijuana on Mr. Ingram's person. Tr. 78.

24. The Defendants were transported to Troop 2 of the Delaware State Police at around 9:00 p.m. Tr. 79. Because Det. Jones stayed with the Saturn until it was towed, he did not arrive at the station until approximately 11:00 p.m. Tr. 79–80. Once at the station, Det. Jones weighed and secured the evidence, filled out reports, and completed warrants. Tr. 80. In order to complete the warrants, Supervisor Cronin ran a check of the Defendants' criminal histories to determine if any of the Defendants were persons prohibited from carrying firearms. Tr. 85, 142–43. Mr. Grant was a person prohibited, and his arrest warrant, which Det. Jones completed by 2:35 a.m., reflected this fact. Tr. 164–66. During this time, Defendants were kept in a holding area seated on benches. Tr. 79. Defendants were removed from the holding area for a period of time in order to be fingerprinted and processed. Tr. 141. During processing, Defendants were asked for pedigree information, *e.g.*, name, address, date of birth, and social security number. Tr. 139, 145.

25. Det. Meadows interviewed Mr. Foster at 12:05 a.m. on May 22, 2002, and Mr. Foster provided a statement. Tr. 139. Det. Jones spoke with Mr. Ingram at approximately 2:30 a.m., but Mr. Ingram refused to make a statement on the record. Tr. 148.

26. Before 4:28 a.m., Det. Jones had a conversation with Mr. Grant, who had not been provided with *Miranda* warnings, during which Mr. Grant stated that he was not supposed to be out of the State of New York because he was on probation or parole.[5] Tr. 142–44, 162.

27. Det. Jones testified that at some point Mr. Grant said he wanted to make a

---

5. The following exchange occurred between Det. Jones and Mr. Deckers during the November 4, 2002, suppression hearing:

statement, and thus, Det. Jones took Mr. Grant into the GTF office to interview him. Tr. 80–81. Before interviewing Mr. Grant, Det. Jones was aware that Mr. Grant had at least four prior drug convictions. Tr. 86.

28. Det. Jones gave Mr. Grant his *Miranda* warnings at 4:28 a.m. on May 22, 2002, using a written *Miranda* form that Mr. Grant signed. Tr. 79, 82; Gov. Ex. 1. Det. Jones read the *Miranda* form to Mr. Grant, and Mr. Grant gave verbal affirmations to each question on the *Miranda* form. Tr. 83, 158–59. Det. Jones then handed the *Miranda* form to Mr. Grant, who looked it over and signed it. Tr. 83. Mr. Grant appeared coherent when he waived his *Miranda* rights; he was not falling asleep and did not appear intoxicated. Tr. 83. Mr. Grant was not handcuffed during his interview with Det. Jones, and no one else was present in the room. Tr. 81. Det. Jones testified that during the interview he did not threaten Mr. Grant, did not yell at Mr. Grant, did not promise Mr. Grant leniency, did not make any false statements to Mr. Grant, and did not use physical force against Mr. Grant. Tr. 84–85. During the interview, which lasted approximately nine minutes, Mr. Grant described his involvement with the seized drugs and gun. Tr. 86–87.

## CONCLUSIONS OF LAW

■ 1. Defendants contend disclosure of the CI's identity "could lead to exculpa-

tory information" (D.I. 65 at 12); *see also* (D.I. 64 at 8), and therefore, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the CI's identity should be disclosed. However, "[a] defendant who merely hopes (without showing a likelihood) that disclosure will lead to evidence ... has not shown that disclosure will be relevant and helpful to the defense. . . ." *United States v. Brown,* 3 F.3d 673, 679 (3d Cir.1993). Because Defendants have not shown a likelihood that disclosure would lead to exculpatory evidence, the Court concludes that *Brady* does not mandate disclosure of the CI's identity in the instant case.

■ 2. The Government has a limited privilege to withhold from disclosure the identity of a CI. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). There is no "fixed rule" as to when disclosure is required; rather, trial courts must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense, ... taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. 623.

■ 3. The identity of a CI who was an active participant in the transaction at issue need not be released until one week

---

Q. But you remember Mr. Grant saying in response to that information [probation status], "This is going to hurt me" or something to that effect?
A. I remember him saying that he wasn't supposed to be out of the state of New York.
Q. All right. Now -
A. I don't know his exact words, but the conversation was this isn't going to do—you know, this isn't going to be in my [Mr. Grant's] best interest right now.

Q. And going back to my original question which prompted all this, did you have the typical, 'Look, now is your opportunity. You help us, we'll help you?'
A. The way I usually start the conversations or way is I told him the list of charges. I can't remember what the exact number was—seven or eight.
Q. When did you tell him that? When he was sitting out in the hallway?
A. Sometime before the interview.
Tr. 143:4–21.

before trial if the Government indicates its intention to call the CI as a witness at trial and if the Government provides the defendant with the necessary impeachment information at that time. *United States v. Beckett*, 889 F.Supp. 152, 155 (D.Del.1995); *see also United States v. Almodovar,* 1996 WL 700267 at *8 (D.Del. Nov.26, 1996). In the instant case, the CI was an active participant, and the Government intends to have the CI testify at trial. (D.I. 53 at 4, D.I. 55 at 4). Thus, Defendants will be able to cross-examine the CI and impeach his testimony in open court.

4. Defendants argue that the disclosure of the CI's identity in prior proceedings in this case supports their argument that the Government should immediately disclose all relevant information so they can adequately investigate and prepare their defense; however, the Court is persuaded that premature disclosure of the CI's identity actually cuts against Defendants' position. Because Defendants already know the CI's identity, their investigation into the CI's background can begin without further disclosure by the Government.

■ 5. Nonetheless, under *Beckett*, the Government must, at a minimum, provide the following impeachment materials to the defense one week prior to trial regarding a CI that was an active participant in the transaction at issue and who will testify at trial:

   a. The number of cases in which the CI has been involved with law enforcement, the role played by the CI in each, and the results of those cases;

   b. A list of the CI's prior convictions;

   c. Information concerning the CI's prior arrests which relates to impeachment material;

   d. Information concerning misconduct of the CI reflecting on his candor, truthfulness, or law-abiding character;

   e. Copies of writings between the government and the CI that pertain to agreements between the two;

   f. Any information, agent's reports, or other writings regarding promises of immunity, leniency, preferential treatment, or other inducements made to the CI or to any family member, friend, or associate of the CI, in exchange for the CI's cooperation, including the dismissal or reduction of charges, assisting in matters of sentencing or deportation, or promises or expectancies regarding payments for expenses or testimony or eligibility for award or reward;

   g. Information concerning monies paid to the informant;

   h. The CI's identity;

   i. Any other material required by the Jencks Act, 18 U.S.C. § 3500.

*Beckett*, 889 F.Supp. at 155–56. The Government has expressed its intent to comply with *Beckett* (D.I.53, 55, 68), and thus, the Court will grant the Motion as to the disclosure, one week prior to trial, of the above materials.

■ 6. By their Motions, Defendants present additional broad requests for information about the CI without accompanying argument or controlling, relevant [6]

6. In the Post–Hearing Brief in Support of Defendant Ingram's Motion to Suppress Evidence and Defendant's Motion for Information Regarding Informant (D.I.64), Defendant contends:

Case law has dictated information that should be provided to the defense in these situations: a. Disclosure of any agreement with the informant. *Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969).... c. Drug and alcohol

legal authority in support thereof. Because "a criminal defendant does not have the right to full discovery of the government's case," *United States v. Casseus*, 282 F.3d 253, 257 (3d Cir.2002), and because production of items (a)-(i) listed in Paragraph 5 sufficiently balances the interests of the defendant and the government as described in *Rovario*, the Court will deny Defendants' requests that exceed the limits set forth in Paragraph 5. For all of the above reasons and because of the risk of potential harm to the CI as evidenced by the alleged pre-arrest conduct of Defendants, the Court will also deny Defendants' request to conduct a pre-trial interview of the CI.

7. The Fourth Amendment to the United States Constitution, made applicable to the States by way of the Fourteenth Amendment, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV; *see also* U.S. Const. amend XIV; *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

8. The United States Supreme Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer may temporarily seize a private citizen based on a reasonable suspicion that he or she is engaged in criminal conduct. Generally, for a suspicion to be reasonable, an officer must be able to articulate specific facts that support the suspicion and thus justify the intrusion.

*Terry*, 392 U.S. at 21, 88 S.Ct. 1868. In evaluating whether a particular seizure or search was reasonable, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. 1868.

█ 9. In the instant case, based on the facts known to the officers when they seized Defendants by boxing their car in at the intersection of Memorial Drive and U.S. 13, the Court concludes that the officers' suspicion that Defendants were engaged in criminal activity was reasonable. The officers had first-hand information from the CI that there was a loaded MAC–10 in the front seat of the car and narcotics in the trunk. The CI had relayed the above information by cell phone from inside the car. The CI, who had reported that his life had been threatened by one of the Defendants, had also relayed that the car, a maroon Saturn with North or South Carolina license plates, was headed north towards Wilmington from the DuPont Parkway Apartments with four occupants planning to commit armed robberies in Wilmington. The officers were able to verify the CI's information regarding the car's model, color, plates, location, direction of travel, and number of occupants before executing the investigatory stop. Additionally, the CI was not anonymous;

use. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).... e. Prior testimony while acting as an informant. *Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). (D.I. 64 at 8). The citations in the above quotation are in effect misrepresentations because *Giglio* and *Giordano* do not stand for the propositions for which they are cited. Contrary to Defendant's assertion, *Giglio* actually deals with the Government's failure "to

disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government." *Giglio*, 405 U.S. at 150–51, 92 S.Ct. 763. Also contrary to Defendant's assertion, the one-paragraph *per curiam* opinion in *Giordano* remanded the case to the district court for it to determine whether "the Government's electronic surveillance was unlawful." *Giordano*, 394 U.S. at 312–13, 89 S.Ct. 1163.

rather, he was a known probationer who could be held accountable for providing misleading information. The Court concludes that the specific facts discussed above support the reasonableness of the officers' suspicion and justify their *Terry* investigative stop of Defendants.

■ 10. Defendants, relying solely on *United States v. Solomon*, 728 F.Supp. 1544, 1546–47 (S.D.Fla.1990), contend that the amount of force used by the officers to effectuate the stop mandates that the stop be viewed as an arrest requiring probable cause rather than a *Terry* investigative stop requiring reasonable suspicion. After examining the controlling case law on the issue, the Court concludes that Defendants contention is without merit. The United States Supreme Court has stated that, when police officers make an investigative stop, they may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *United States v. Edwards*, the United States Court of Appeals for the Third Circuit held that "police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest *per se.*" 53 F.3d 616, 619–20 (3d Cir.1995); *see also United States v. White*, 648 F.2d 29, 31 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981) (holding that blocking the defendant's car with police cruisers and approaching with guns drawn constituted a reasonable *Terry* stop in response to an anonymous tip concerning drug activity); *United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993) (blocking suspect's car with three unmarked cars and approaching with weapons drawn was not an arrest); *United States v. Lechuga*, 925 F.2d 1035, 1041 (7th Cir.1991) ("sandwiching" suspects' car with

unmarked police cars and one officer approaching with his gun drawn was not an arrest); *United States v. Jackson*, 918 F.2d 236, 238 (1st Cir.1990) (blocking suspects' vehicle with two police cruisers, approaching with guns drawn, ordering suspects to put their hands on dashboard and subsequently frisking them did not constitute arrest); *United States v. Jones*, 759 F.2d 633, 637 (8th Cir.) (officers' actions in blocking vehicle, approaching with guns drawn and ordering suspect out of car was not an arrest), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Applying these considerations to the facts of the instant case, the Court concludes that the officers' conduct was reasonable and did not rise to the level of an arrest. The officers surrounded Defendants' car and emerged with their guns drawn to protect themselves from the very real risk posed by Defendants' potential use of the loaded MAC–11 in the front seat. The Court finds the officers' show of force was reasonable under these circumstances.

■ 11. Once the officers' executed a valid *Terry* investigative stop of Defendants' car, the officers conducted a protective frisk of the passenger area of the car to ascertain whether any weapons were present. Such a protective frisk is allowed under *Terry* and its progeny if the officers have a reasonable suspicion that the car's occupants are armed or dangerous. *Edwards*, 53 F.3d at 618 ("a police officer, during the course of a *Terry* stop, may conduct a 'reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual....'"). In *Michigan v. Long*, the United States Supreme Court explained the rationale for allowing protective frisks of the passenger area of automobiles:

Our past cases indicate then that protection of police and others can justify pro-

tective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Applying the above standards to the facts of the instant case, the Court concludes that Det. Clemons' examination of the passenger area of the Defendants' car for weapons was justified based on the CI's reports that Defendants had a loaded MAC–10 in the front seat. The Court's conclusion regarding the reasonableness of the officers' suspicion that Defendants were armed and dangerous is buttressed by Det. Clemons' observation of what he believed was the passenger's furtive attempt to put something under the front seat just before the car was stopped. Upon looking in the front seat, Det. Clemons saw the butt of a weapon sticking out of a bag on the floor area of the front passenger seat of the car. For these reasons, the Court concludes that Det. Clemons discovery of the loaded MAC–11 in the front seat of Defendants' car was justified because it occurred in the context of a valid *Terry* protective frisk of the passenger compartment of the car.

■ 12. Once the officers discovered the MAC–11, which the CI had understandably, because of the many similarities,[7] mis-identified as a MAC–10, the officers had probable cause to arrest the occupants of the car. Additionally, the Court concludes the discovery of the MAC–11 gave the officers probable cause to search the entire car, including the trunk, under the automobile exception to the warrant requirement. *See United States v. Burton,* 288 F.3d 91, 100 (3d Cir.2002) ("The automobile exception ... permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'"). Thus, the officers' discovery of 37.1 grams of cocaine, 9.8 grams of heroin, and miscellaneous drug paraphernalia in the trunk of the car comported with the Fourth Amendment, as did the officers' discovery of 11 bags of marijuana in the pocket of a jacket on the back seat of the car.

13. The Fifth Amendment to the United States Constitution, which applies to the States by way of the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V; *see also* U.S. Const. amend XIV; *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

14. The United States Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that:

the prosecution may not use statements, whether exculpatory or inculpatory,

---

**7.** William D. Ehringer, Ph.D., *A MAC History Lesson: A Comparison Of The Military Armament Corporation Model 10/9 mm (MAC–10/9) And The Sylvia And Wayne Daniels M11 (SWD M11/9) and other MAC-type weapons,* at http://www.firearmsid.com/Feature¨Articles/012001/Mac10History.htm

stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602.

■■■ 15. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any way." *Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Interrogation occurs when a suspect is "subjected to express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The functional equivalent of interrogation consists of "words or actions on the part of police ... that the police should know are reasonably likely to elicit an incriminating response from the subject." *Id.* at 301, 100 S.Ct. 1682.

■■■ 16. It is uncontested that Mr. Grant was in custody during all times relevant to the Court's Fifth Amendment analysis; thus the issue is whether Mr. Grant was subjected to interrogation prior to receiving his *Miranda* warnings. Based on Det. Jones' testimony at the November 4, 2002, suppression hearing, the Court concludes that Det. Jones subjected Mr. Grant to express questioning or its functional equivalent prior to advising him of his *Miranda* rights. At the suppression hearing, Det. Jones testified that he had a conversation with Mr. Grant in which Mr. Grant stated that he should not be out of the State of New York because he was on parole or probation. Tr. 143:4–21. On redirect, AUSA Anne Park, Esq., asked Det. Jones, "At the time you heard him [Mr. Grant] say that he should not be out of New York, did you ask him any specific questions?," and Det. Jones replied, "I think I asked him what he got arrested for." Tr. 157. When Det. Jones was asked, "did you have the typical, 'Look, now is your opportunity. You help us, we'll help you?,'" he replied "[t]he way I usually start the conversations or way is I told him the list of charges." Tr. 143:13–17. Det. Jones then testified that he had this conversation with Mr. Grant "[s]ometime before the interview." Tr. 143:21. Mr. Grant was not advised of his *Miranda* rights until the interview. Tr. 79–82. The above testimony demonstrates that Det. Jones had a substantive conversation, *i.e.,* regarding non-pedigree information, with Mr. Grant prior to any *Miranda* warnings. Moreover, the testimony shows that Det. Jones, in direct contravention of *Innis,* asked at least one express question of Mr. Grant during the conversation. Additionally, Det. Jones implicitly answered yes to the question "did you have the typical, 'Look, now is your opportunity. You help us, we'll help you?'" Det. Jones replied "[t]he way I usually start the conversa-

tions . . . .," which seemingly indicates that he had the typical "now is your chance to help yourself" conversation with Mr. Grant prior to advising him of his *Miranda* rights. The Court's interpretation of Det. Jones' testimony is supported by the fact that the post-*Miranda* interview took a total of nine minutes, which, in the Court's view, is a very brief amount of time for such an event. However, if most of the negotiations occurred prior to the nine-minute clock being started, then the brevity of the official interview makes sense. Additional facts and testimony by Det. Jones support the Court's conclusion that the conversation at issue occurred prior to 4:28 a.m., the time at which the *Miranda* warnings were actually given. Det. Jones testified that he "wasn't sure of his [Mr. Grant's] Probation/Parole status but he relayed to me he wasn't supposed to be outside the state of New York without permission as part of his condition of release." Tr. 154. This testimony indicates that at the time Det. Jones and Mr. Grant had their conversation, Det. Jones was not aware of Mr. Grant's probation or parole status. However, Det. Jones testified that he was aware of Mr. Grant's parole status when he executed Mr. Grant's arrest warrant at 2:30 a.m. Tr. 164–66. Viewing these two facts together, the Court concludes that Det. Jones had a substantive conversation with Mr. Grant before 2:30 a.m., which is two hours before Mr. Grant received his *Miranda* warnings. In its Brief, the Government seems to suggest that the Court should not suppress Mr. Grant's statements because he is thirty-two years old and has multiple prior convictions (D.I. 68 at 29); however, the Court is unaware of any legal authority holding that the procedural safeguards of *Miranda* should be applied on a sliding-scale basis. For the reasons discussed, the Court concludes that on May 21, 2002, or May 22, 2002, Det. Jones subjected Mr. Grant to custodial interrogation without the benefit of *Miranda* warnings; therefore, the statements were obtained in violation of the Fifth Amendment and must be suppressed. Additionally, the Court concludes that Det. Jones' post-*Miranda* interview of Mr. Grant was so tainted by the earlier constitutional violation that Mr. Grant's waiver was invalid, and thus, the Court will suppress Mr. Grant's post-*Miranda* statement as well.

## CONCLUSION

For the reasons discussed, Defendant Grant's Motion to Suppress Evidence (D.I.41–1) will be granted in part and denied in part. Defendant Grant's Motion to Disclose Information Regarding the Confidential Informant (D.I.43) will also be granted in part and denied in part. Defendant Ingram's Motions to Suppress Evidence (D.I.45, 46) will be denied. Defendant Ingram's Motion to Disclose Information Regarding the Confidential Informant (D.I.47) will be granted in part and denied in part.