UNITED STATES of America, Plaintiff–Appellee,

v.

Alfredo F. GONZALEZ, Defendant– Appellant.

No. 90–5333.

United States Court of Appeals, Eleventh Circuit.

Aug. 21, 1992.

---

G. Richard Strafer, Jose M. Quinon, Quinon & Strafer, P.A., Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., Michael Walleisa, Linda Collins Hertz, Lynne W. Lamprecht, Asst. U.S. Attys., Ft. Lauderdale, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, MORGAN, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Defendant Alfredo Gonzalez entered a conditional plea of guilty to charges of conspiring to possess with intent to distribute and possessing with intent to distribute at least five kilograms of cocaine. He now appeals the district court's denial of his motion to suppress evidence, claiming law enforcement officers lacked probable cause for his arrest and that the search of his car was thus tainted by the illegal arrest. We REMAND the case to the district court for additional fact finding as explained below.

## FACTS

*Testimony at the Motion to Suppress*

On September 28, 1989, Special Agent David Tinsley of the Drug Enforcement Administration (DEA) received the first in a series of tips about the cocaine smuggling activities of Alfredo Gonzalez and Ernesto Barrios. The telephone informants, a man and a woman, declined to identify themselves.

Over the next few days, Agent Tinsley received seven or eight calls from the tipsters, who provided him with specific information including .the names of Gonzalez, his wife, Jeanette Gonzalez, and Barrios; physical descriptions of the three conspirators; vehicle descriptions, including license plate numbers; the address and description of the Gonzalez residence; a description of a yacht called the "Royal Highness II"; estimations of the yacht's time and place of arrival at one of two south Florida marinas; the ultimate destination of the cocaine; and the method of shipping the cocaine in secret compartments built into the yacht. Tinsley verified names, addresses, licenses and vehicle descriptions. He also discovered that United States Customs suspected Gonzalez and Barrios of smuggling and that the Royal Highness II had been stopped and searched before, but no contraband had been found. He was unable to verify previous successful smuggling trips. The female tipster also told Tinsley that Mrs. Gonzalez would be travelling by yacht to the Bahamas to pick up cocaine, but Mrs. Gonzalez never made the trip.[1]

Based on the tips, Tinsley immediately set up surveillance of the Gonzalez' home in Coral Gables with assistance from the local police department. On the evening of October 1, 1989, the anonymous callers informed Tinsley that the yacht would be arriving at a marina in Fort Lauderdale with a shipment of 20 kilograms of cocaine

---

1. Barrios later testified that the original plan was for Mrs. Gonzalez to go to the Bahamas, but that plans changed due to bad weather.

and that Mrs. Gonzalez would be travelling to the marina in a blue Mercedes with a certain tag number to pick up Mr. Gonzalez and Barrios. The next day, as predicted, Mrs. Gonzalez left the house in the blue Mercedes and drove north to the Bahia Mar Marina in Fort Lauderdale. She drove at a high rate of speed, closely following a red Oldsmobile. Coral Gables Detective Jeffrey Vance followed the two cars. He had trouble getting into the marina, but approximately five to ten minutes after the Mercedes and Oldsmobile reached the marina, he saw the Oldsmobile leave.

Detective Vance's delay entering the marina prevented him from seeing Mrs. Gonzalez for a few minutes after she parked the car. He next saw Mrs. Gonzalez when she stepped off the Royal Highness II and walked to another vessel, a demonstrator for sale by the marina. She climbed up to the demonstrator's flying bridge and sat watching for approximately ten or fifteen minutes. While she was there, Vance walked past and exchanged pleasantries with the woman, who replied in Spanish.[2] Mrs. Gonzalez eventually got down from the flying bridge and went back to the blue Mercedes.

Vance then observed Mr. Gonzalez and Barrios inside the Royal Highness II. They left the vessel approximately fifteen minutes later, carrying three bags which appeared to be heavy. They took the bags to the trunk of the blue Mercedes, then drove south with Mrs. Gonzalez. On the return trip, the Mercedes drove carefully, never exceeding the speed limit.

The car drove past the Gonzalez residence, then made a U-turn and pulled in.[3] Ten to twelve agents and detectives were waiting. Half were in uniform and half were in street clothes. The agents/detectives were armed; according to Gonzalez, they had guns drawn. Agent Tinsley, Detective Vance, and Detective Garcia ap-

proached the car. They identified themselves and told Gonzalez, his wife, and Barrios to get out of the car and sit on the ground apart from each other. According to Vance, "[the conspirators] were under arrest as soon as we got there."

Tinsley and Garcia then walked with Gonzalez to the back of the car. They testified that they first advised Gonzalez of his *Miranda* rights;[4] then told him they believed narcotics were in the trunk and requested his consent to search the car. They explained the consent to search form in both English and Spanish. In response to Gonzalez' question, they told him that they would not search his house.[5] After reviewing the consent form, Gonzalez requested that Tinsley change the word "residence" to "vehicle" and write in "Blue Mercedes" with the appropriate license tag number. Once these changes were made, Gonzalez signed the form.

Tinsley discovered three travel bags in the trunk. The bags contained coffee wrapped in dark plastic garbage bag material, and inside the coffee, cocaine. While Tinsley searched, Garcia asked Gonzalez how much was in the trunk. Gonzalez replied "twenty;" later measurements confirmed a total of twenty kilos, as predicted by the informants. Gonzalez, his wife, and Barrios were then taken to the police station.

The grand jury indicted all three with conspiring to possess with intent to distribute and possessing with intent to distribute at least five kilograms of cocaine. Both Mr. and Mrs. Gonzalez filed a motion to suppress, which was denied following an evidentiary hearing. The district court decided that the officers had probable cause to believe there was cocaine in the trunk. The court also concluded that the consent to search had been freely, voluntarily, and intelligently given by Gonzalez without

---

**2.** Vance was in plain clothes and travelling in an unmarked police car.

**3.** A median strip blocked a direct turn into the driveway.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** Gonzalez denied being advised of his *Miranda* rights and testified that the agents threatened to search his house unless he signed the consent form.

force, threats, or promises, and that Gonzalez had been advised of his *Miranda* rights at the scene of his arrest. Gonzalez entered a conditional plea of guilty, reserving his right to appeal the order denying his motion to suppress.

*Testimony at the Trial of Jeanette Gonzalez*

Mrs. Gonzalez' first trial ended in a hung jury. She was acquitted on retrial. During Mrs. Gonzalez' second trial, Detective Vance acknowledged that he had made a mistake in his previous identification of Mrs. Gonzalez as the woman on the flying bridge. He stated that he had made his initial identification based upon his observations that the female who drove the Mercedes from the Gonzalez home to the marina had blond hair, the woman he had observed on the flying bridge of the boat at the marina had blond hair, Mrs. Gonzalez had been previously described by an anonymous caller as a blond latin female, and later, a blond Mrs. Gonzalez was arrested along with her husband and Barrios in the Mercedes where the cocaine was stored. Vance realized his mistake after he had the opportunity to see and hear the testimony of one of the defense witnesses during the first trial of Jeanette Gonzalez. At the second trial, he testified that Jeanette Gonzalez was not the person on the flying bridge of the boat at the Fort Lauderdale marina. He also modified his characterization of the U-turn near the Gonzalez' home as surveillance, instead agreeing that there was "nothing unusual" about the turn.

*Testimony at the Post–Judgment Hearing for Additional Fact Finding*

Based upon the changes in testimony, Mr. Gonzalez moved for additional fact finding regarding his prior motion to suppress. At the ensuing evidentiary hearing, Vance testified that he had not met Mrs. Gonzalez before the date of her arrest. As he followed her to the marina that day, he was never closer than half a block and he had been able to determine only that the vehicle was operated by a female with blond hair. Because it was dusk when he observed the woman on the flying bridge,

he was able to ascertain only that this woman was a latin female with blond hair who fit the description of Jeanette Gonzalez. Vance reiterated that he realized his mistake after he had the opportunity to see and hear the testimony of one of the defense witnesses during the first trial of Mrs. Gonzalez.

The district court found that Detective Vance had not deliberately lied, but had made a mistake in identification. The court summarily denied Gonzalez' request for additional fact finding. No explanation of the factors considered in redetermining probable cause was provided.

## PROBABLE CAUSE TO ARREST GONZALEZ

■ Gonzalez contends that his warrantless arrest was unsupported by probable cause, and that, therefore, the district court erred in denying his motion to suppress the evidence (cocaine) seized. Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Probable cause determinations traditionally have been guided by reviewing the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

*The Informants' Tips*

■ In *Illinois v. Gates,* the Supreme Court approved a "totality of the circumstances" approach to determining when information provided by an informant is sufficient to create probable cause. *Id.* at 230–34, 103 S.Ct. at 2328–30. The tip in *Gates* was an anonymous letter stating that respondents, husband and wife, were engaged in selling drugs; that the wife would drive their car to Florida on a certain date to be loaded with drugs, and the husband would fly down in a few days to drive the car back; that the car's trunk would be loaded with drugs; and that respondents had over $100,000 worth of drugs in their basement. *Id.* at 225, 103 S.Ct. at 2325.

The Court decided that, while an informant's "veracity," "reliability," and "basis of knowledge" are relevant factors in the probable cause analysis, corroboration of the details of an informant's tip by independent police work is of significant value, particularly in the context of an anonymous informant. *Id.* at 230, 242, 103 S.Ct. at 2328, 2334.

The government points out that the DEA and Coral Gables police did, in fact, corroborate most of the information provided by the unknown callers. But a review of the record shows that the details Agent Tinsley was actually able to confirm consisted of innocent facts such as names, addresses and descriptions of the parties involved.

Although "innocent behavior frequently will provide the basis for showing of probable cause ... [i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13. Even Mrs. Gonzalez' predicted trip to the marina was not inherently suspicious. *See United States v. Solomon,* 728 F.Supp. 1544, 1548 (S.D.Fla. 1990) ("Unlike the short trip to another state in *Gates,* a trip northward on the Florida Turnpike is not suspicious. Unlike *Gates,* [defendants] reside in Florida. Their trip was as readily explainable as a pleasure excursion as a drug run."). And Tinsley was unable to discover any trip by Mrs. Gonzalez to the Bahamas or any proof that the Royal Highness II, Mr. Gonzalez, or Barrios had transported cocaine before. Tinsley could only corroborate "the innocent activities of a couple who lived at a certain address, owned certain personalty, and who happened to take a ... [short] trip northward." *Solomon,* 728 F.Supp. at 1548.[6] We worry that the informants' tips and corroboration in this case might have given officers no more than reasonable sus-picion sufficient to make a brief investigatory stop. *See Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (reasonable suspicion for stop found where some of anonymous caller's information was incorrect, tip was not as detailed, and corroboration not as complete as in *Gates,* but much of tip corroborated); *United States v. Campbell,* 920 F.2d 793 (11th Cir.1991) (reasonable suspicion to stop found where police corroborated unknown informant's last minute details predicting drug transport and route to be taken by woman named "Yoli," accompanied by three armed Mexicans).

### Other Factors To Be Considered For Probable Cause

Along with reliable or corroborated tips, the observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause for an arrest. In this case, we think Mrs. Gonzalez' driving patterns and the detective's perception that counter-surveillance measures were in effect significantly enhanced the measure of suspicion which officers already had based on the corroborated tips.

The driving patterns which we think contributed to probable cause are the speeding trip to the marina, and the contrasting return home, during which the speed limit was never broken. These maneuvers may be open to innocent explanations. But the determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers *on the scene.* At the time of the arrest and in conjunction with the reasonable suspicion created by corroboration of the informants' tips, the officers could reasonably have believed that the speeding reflected an effort to get the cocaine shipment unloaded quickly, and the slow, careful return drive reflected an effort to avoid

---

**6.** Some of the tips were verified after the arrest, for example, the quantity of cocaine (twenty kilos), the secret compartments on the yacht, and that the original plan actually required Mrs. Gonzalez to travel to the Bahamas. But this information plays no role in a probable cause determination: the court must decide whether the objective facts available to the officers *at the time of arrest* were sufficient to justify a reasonable belief that an offense was being committed. *See Beck,* 379 U.S. at 96, 85 S.Ct. at 228.

attracting attention while the stash was in the car.

Officers were also aware that a U-turn, while in this case necessary to circumvent the median on the street where the Gonzalezes lived, often functions as a useful counter-surveillance tool to see if the driver is being followed. "The officers' experience may be considered in determining probable cause.... Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Fouche,* 776 F.2d 1398, 1403–04 (9th Cir. 1985) (clothing description contributed to probable cause even though clothing not unusual; sweating and apparent nervousness also contributed to probable cause even though day was hot; if viewed alone, these factors were insignificant, but important in the totality to link arrestee to robbery); *United States v. McGlynn,* 671 F.2d 1140, 1144 (8th Cir.1982) (officers' observations of defendant's potentially noncriminal activities exchanging packages and behaving furtively entitled to some weight in probable cause determination).

Particularly important in the probable cause calculation is Detective Vance's impression that Mrs. Gonzalez was conducting counter-surveillance from her post on the flying bridge at the marina. That he was ultimately found to be mistaken does not detract from the legitimate contribution this impression—*if his mistake was objectively reasonable*[7]—made at the time to the totality of the circumstances leading to probable cause.

The Supreme Court has repeatedly recognized "the need to allow some latitude for honest mistakes that are made by offi-

cers in the dangerous and difficult process of making arrests and executing search warrants." *Maryland v. Garrison,* 480 U.S. 79, 87, 107 S.Ct. 1013, 1018, 94 L.Ed.2d 72 (1987) (search of defendant's apartment by mistake was valid because objective facts available to officers at the time suggested there was only one apartment on third floor and there was no clear distinction between third party's apartment and third-floor premises). More recently the Court pointed out that "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990) (warrantless entry valid when based upon consent of third party whom police, at time of entry, reasonably believe to possess common authority over premises, but who in fact does not). *See also Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) ("[probable cause] does not demand any showing that such a belief be correct or more likely true than false").

In *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Court considered the validity of the arrest of a man named Miller based upon the mistaken belief that he was Hill. The police had probable cause to arrest Hill and believed in good faith that Miller was Hill when they found Miller in Hill's apartment.

The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it

---

**7.** Much of Gonzalez' supplemental brief to this court is about the good faith exception to the exclusionary rule. But this case is not about the good faith exception. That exception keeps evidence from being suppressed when law enforcement officers obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause, *see United States v. Leon,* 468 U.S. 897, 913, 920, 104 S.Ct. 3405, 3415, 3419, 82 L.Ed.2d 677 (1984), and has been extended to situations where officers are called upon to interpret or rely upon an external source of authority such as a statute, which later turns out to be invalid or not to

authorize the action taken, *see, e.g., Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Williams,* 622 F.2d 830, 844 (5th Cir.1980) (en banc); or where officers have based their conduct on recognized exceptions to the warrant requirement itself, such as consent. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The exception thus always involves circumstances in which evidence is permitted despite the *absence* of probable cause. In this case, in contrast, we review whether, as a matter of law, probable cause existed in the first instance.

turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

*Hill,* 401 U.S. at 803–04, 91 S.Ct. at 1110–11.

The Second Circuit has upheld the arrest and search incident to arrest where police arrested the wrong man. *United States v. DeLeon,* 561 F.2d 421 (2d Cir.1977). In view of all the information available to the police, including the fact that the defendant fit the general description of the suspects who allegedly attempted to pass counterfeit bills, was driving a highly distinctive car which fit the description of the car driven by suspects, and evinced consciousness of guilt by attempting to lock the car door when police approached, the officers had probable cause to believe defendant was one of the suspects they sought. The arrest was lawful even though the defendant was not one of the men who had attempted to pass the bill. *Id.* at 423.

In *United States v. Glasser,* 750 F.2d 1197, 1206 (3d Cir.1984), DEA agents knew that a package mailed from Jamaica and delivered by postal authorities as part of a controlled delivery contained contraband. They were also aware that it is common practice for drug smugglers to have a package delivered to someone other than the ultimate recipient to avoid detection. The defendant arrived empty-handed at the house to which the package was delivered a little more than an hour after delivery and left five to ten minutes later, carrying a brown bag. Agents mistakenly thought he was carrying the original control package (which had not been a brown bag) and arrested defendant. The arrest was upheld despite the error, which had contributed to

probable cause to believe defendant was carrying contraband. *Id.* at 1206. *See also United States v. DeLeon–Reyna,* 930 F.2d 396, 399–401 (5th Cir.1991) (en banc) (reasonable suspicion for stop found when border agent relies on incorrect information from other agents if, after reviewing totality of circumstances, objectively reasonable officer would have relied on information in deciding whether to stop vehicle); *United States v. Garcia,* 942 F.2d 873, 876–77 (5th Cir.1991) (based on totality of circumstances, border agent's reliance on incorrect information provided by dispatcher did not invalidate stop of vehicle), *cert. denied,* —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992).

"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). We agree with the district court's decision that Detective Vance's misidentification of the blond latin female on the flying bridge at the marina was an honest mistake; but the important questions remain whether the mistake was an objectively reasonable mistake and whether it was objectively reasonable, under the circumstances, for the detective to rely on his impressions in calculating probable cause.

If the answer to these questions is "yes," probable cause undoubtedly existed for the arrest underlying this appeal. If the answer is "no," this case is considerably closer and raises doubts. We therefore remand the case for further proceedings in the district court, including specific fact finding on these important questions about the reasonableness, at the time and under the circumstances, of Detective Vance's mistaken belief about countersurveillance.[8]

---

8. Gonzalez contends that the government has waived the issue of reliance on a mistaken view of the facts (or as Gonzalez phrased it, good faith mistake, *see supra* note 7). After review-

ing the record, we disagree. Although the government made certain ambiguous comments and referred more than once to the court's determination of probable cause "even if the court

A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances. When a district court accepts a mistaken belief as a factor to be counted, the court should first find that the mistake was, itself, a reasonable one.

REMANDED.

were to disregard Detective Vance's testimony regarding the presence of Mrs. Gonzalez on the flying bridge ...", it is not plain to us that the government intended that the court necessarily disregard this testimony or conceded that the information ought to be given no weight. Combined with the government's assertions of innocent mistake, these comments do not establish a waiver of the issue.