[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13325
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 19, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00037-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN VILLEGAS-TELLO,
JOSE MARTIN OROZCO-CUELLAR,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

(March 19, 2009)

Before BIRCH, HULL and FAY, Circuit Judges.

PER CURIAM:

Jose Martin Orozco-Cuellar and Martin Villegas-Tello appeal their convictions, and Orozco-Cuellar appeals his sentence, for conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 841. Orozco-Cuellar and Villegas-Tello each argue that the district court erred in admitting post-arrest statements by Orozco-Cuellar. Before trial, Orozco-Cuellar asserted in a motion to suppress that the statements violated Miranda v. Arizona, 384 U.S. 436, 458-71, 86 S.Ct. 1602, 1619-26, 16 L.Ed.2d 694 (1966), as the arresting agents lacked probable cause to arrest him and the statements were the product of interrogation before he was made aware of his rights. Villegas-Tello asserted in a motion in limine that the statements violated Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622-23, 20 L.Ed.2d 476 (1968), as they suggested his guilt and Orozco-Cuellar did not testify, and could not be cross-examined, at their joint jury trial. Orozco-Cuellar and Villegas-Tello also argue that the government failed to present sufficient evidence of their guilt. Orozco-Cuellar finally argues that the district court erred in denying him a minor-role reduction, pursuant to U.S.S.G. § 3B1.2. For the reasons set forth below, we affirm.

## I. Background

*Evidence Presented on Motion to Suppress and Motion in Limine*[1]

---

[1]Most of the evidence stems from an evidentiary hearing held on Orozco-Cuellar's motion to suppress.

Customs and Border Patrol ("CBP") officers discovered boxes of marijuana inside a shipping container at the Port of Savannah. Immigration and Customs Enforcement ("ICE") agents arranged a controlled delivery. They delivered the boxes to a local warehouse, and an unidentified man driving a U-Haul retrieved the boxes. The man drove the U-Haul to a KMart store in Atlanta, parked, and went into the store. A man, later identified as Villegas-Tello, got into the U-Haul and drove north on Interstate-85 ("I-85"). A man later identified as co-indictee Isidro Pulido-Tejedo followed closely in a van. The two stopped at a gas station, and Villegas-Tello spoke with a man later identified as Orozco-Cuellar. Villegas-Tello continued north on I-85, this time followed closely by both Pulido-Tejedo in the van and Orozco-Cuellar in a sedan. The three drove in a "lead car - load car - chase car" pattern frequently used by drug couriers. The ICE agents and other police officers stopped them.

After being stopped, Orozco-Cuellar was instructed to exit his car, told that he was being detained for the purposes of investigation, handcuffed, instructed to enter a police patrol car, and transported one mile to a weigh station. Upon arriving at the weigh station, ICE agent Jeremi Blankley asked if he could speak with Orozco-Cuellar. When Orozco-Cuellar "emphatically" responded in the affirmative, Blankley and another agent walked with Orozco-Cuellar to a nearby

3

warehouse, outside the view of Villegas-Tello and Pulido-Tejedo. Blankley did not inform Orozco-Cuellar why they were walking toward the warehouse. While Blankley and the other agent flanked Orozco-Cuellar and carried holstered guns, they did not physically lead him and he did not appear reluctant to go with them. In the course of their walk, Orozco-Cuellar stated, "[T]he green's not mine." When the ICE agent asked if "green" referred to marijuana, Orozco-Cuellar replied affirmatively and indicated that Pulido-Tejedo told him that the U-Haul carried marijuana.

*Additional Evidence Presented at Joint Jury Trial*

As part of ICE's controlled delivery of the boxes, agent Blankley instructed a transport company to deliver the boxes to the warehouse on January 16, 2007. He and other ICE agents followed and surveilled the scene. A woman later identified as co-indictee Eva Partida counted the boxes. The agents entered the warehouse and had Partida and the manager of the warehouse contact the owner of the boxes and instruct that he pick up the boxes immediately. The next day, a U-Haul arrived at the warehouse and the boxes were retrieved.

As the U-Haul drove north on I-85, ICE agents followed. After making the driver switch at Kmart, the U-Haul and van left I-85 and stopped at a gas station to re-fuel the U-Haul. At the very next exit, the U-Haul and van again left I-85 and

4

stopped at another gas station. Villegas-Tello exited the U-Haul and approached Orozco-Cuellar, who was re-fueling his sedan. The two spoke briefly. Villegas-Tello returned to the U-Haul. Orozco-Cuellar walked over toward Pulido-Tejedo in the van and they spoke briefly. Orozco-Cuellar then "blocked traffic" while the U-Haul backed out of the gas station parking lot. The three then drove "in tandem" north on I-85. Orozco-Cuellar led, Villegas-Tello followed in the U-Haul, and Pulido-Tejedo brought up the rear in the van. Each vehicle remained one or two car lengths from the one in front. They changed lanes together, and sometimes the van would "block traffic" so that the U-Haul could change lanes. They increased speed and reduced speed at the same times and to the same extent. They traveled in this manner for approximately 40 miles. This manner of driving frequently was used by drug couriers.

The agents and other police officers stopped the three vehicles. Upon being arrested, Orozco-Cuellar stated "emphatically," "[T]he green's not mine. The green's not mine." Blankley asked, "Green? What green?" Orozco-Cuellar responded, "[T]he green's not mine." Blankley asked, "The marijuana?" Orozco-Cuellar responded, "[Y]es, it's not mine." Blankley asked, "[W]hose is it?" Orozco-Cuellar responded, "[I]t's the young guy, the young guy is who told me what was in it," and pointed to Pulido-Tejedo. Also upon their arrests, police

5

officers seized the mens' cellular telephones. The phones were direct connect, "walkie-talkie" types, which were commonly used by drug dealers. The agents reviewed the call logs for each phone, which listed the last call made, and noted that Orozco-Cuellar's phone connected with Pulido-Tejedo's phone approximately a half hour before the stop. They also reviewed the telephone records for each phone and noted that Pulido-Tejedo's phone was issued in the name "John Wayne" at an address in Gaffney, South Carolina, on January 11, 2007; Orozco-Cuellar's phone was issued in the name "John Wayne" at 403 North Limestone Street in Gaffney, South Carolina, on January 16, 2007; and Villegas-Tello's phone was issued in the name "DeeTee" at 403 North Limestone Street in Gaffney, South Carolina.

Before the federal grand jury that ultimately indicted Orozco-Cuellar and Villegas-Tello, Villegas-Tello had testified that he and Pulido-Tejedo traveled from South Carolina to Atlanta to retrieve furniture for a person he met at a party. They met Orozco-Cuellar at the gas station so that Orozco-Cuellar could give Villegas-Tello money, as Villegas-Tello did not have enough money to buy gas for the return trip.

## II. Discussion

## A. Post-arrest Statements

*Probable Cause & <u>Miranda</u>*

We review the district court's denial of a motion to suppress evidence as a mixed question of law and fact. United States v. Steed, 548 F.3d 961, 966 (11th Cir. 2008). Specifically, we review the district court's findings of fact for clear error and it s application of the law to those facts de novo. Id.

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."[2] United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992). In determining if such a reasonable belief exists, appellate courts must review the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Indeed, we have held that, "[w]hile presence alone is not

---

[2] As an initial matter, we need not separately address Orozco-Cuellar's argument that the ICE agents lacked reasonable suspicion to stop him. Pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop a person for the purposes of investigation if he has "a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." We have held that "reasonable suspicion" is a less demanding standard than "probable cause." United States v. Lindsay, 482 F.3d 1285, 1290 (11th Cir.), cert. denied, 128 S.Ct. 438 (Oct. 15, 2007). Because the facts known by the ICE agents before stopping the three vehicles were sufficient to establish probable cause, as discussed below, they must also have been sufficient to establish a reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868; Lindsay, 482 F.3d at 1290.

enough to constitute probable cause, presence and additional factors that would lead a prudent person to believe that an offense has been or is being committed is sufficient." United States v. Irurzun, 631 F.2d 60, 63 (5th Cir. 1980). Likewise, we have held that appellate courts may consider the involved police officers' experience, as "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." Gonzalez, 969 F.2d at 1003-04. In so holding, we specifically referenced the defendants' driving patterns and noted that the patterns might have an innocent explanation but nonetheless suggested the probability of criminal wrongdoing. Id.

After a defendant is properly arrested, Miranda requires that he be advised of his right to remain silent and his right to counsel before he is interrogated. Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. In United States v. Savell, 546 F.2d 43, 46 (5th Cir. 1977), our predecessor held that the Miranda rule "does not reach a situation . . . where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation." The Supreme Court has defined "interrogation" as "express questioning" initiated by police officers or its "functional equivalent," namely "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

8

Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

While we have yet to address whether a police officer's follow-up questions, asked for the sake of clarification, to a defendant's spontaneous statements implicate Miranda, several of our sister circuits have held that Miranda also does not reach this situation. See United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985) (holding that a police officer did not initiate the conversation when the police officer picked up the spiral notebook in the course of searching the defendant's home; the defendant stated, "You can't take that"; the police officer asked why not; and the defendant responded, "I can't run my business without that," referring to his marijuana distribution activities; thus, the statement was admissible); United States v. Gonzales, 121 F.3d 928, 939 (5th Cir. 1997) (holding that the district court properly admitted the defendant's answers to a police officer's question when the defendant spontaneously stated, after a police officer had confiscated cocaine from his warehouse, "[W]e made you work for that shit, you all thought you weren't going to find it" and "[A]ll of that is mine"; the police officer questioned to what he was referring; and the defendant stated that he had been referring to "the coke and the gun"); Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990) (holding that a police officer's responsive question did not require

9

Miranda warnings before its utterance when the defendant spontaneously stated upon being arrested, "I stabbed her"; the police officer asked, "Who?"; and the defendant responded, "Cathy," the name of the stabbing victim about whom the police were investigating); Butzin v. Wood, 886 F.2d 1016, 1017-18 (8h Cir. 1989) (holding that the defendant's confession was not the product of interrogation when he told a police officer that he had not been totally honest when making previous statements, the police officer asked what he had not been honest about, and the defendant stated that he had not accidentally bumped his wife, as previously claimed, but had pushed her into the creek because he knew she could not swim and he wanted her to die).

The district court did not err in denying Orozco-Cuellar's motion to suppress. See Steed, 548 F.3d at 966. First, given the totality of the circumstances, the police officers had probable cause to believe that Orozco-Cuellar probably was involved in the marijuana transportation and, therefore, to arrest him. See Gonzalez, 969 F.2d at 1002; Gates, 462 U.S. at 233, 103 S.Ct. at 2329. Specifically, the police officers knew that Villegas-Tello was driving a U-Haul that carried marijuana; Orozco-Cuellar had spoken to Villegas-Tello; and Orozco-Cuellar, Villegas-Tello, and Pulido-Tejedo had then driven in what appeared to be a pattern often used by drug couriers. See Irurzun, 631 F.2d at 63;

10

Gonzalez, 969 F.2d at 1003-04. Although the driving pattern may have been innocent, it nevertheless could have suggested criminal wrongdoing to the trained eye. See Gonzalez, 969 F.2d at 1003-04.

Also, Orozco-Cuellar statements did not violate Miranda. Orozco-Cuellar's initial statement that the "green" was not his was not the product of interrogation. See Innis, 446 U.S. at 301, 100 S.Ct. at 1689. Blankley had not asked Orozco-Cuellar any express questions beyond those generally associated with an arrest. See id.. Blankley and the other agent involved also had done nothing functionally equivalent to express questioning. Asking if an arrestee wished to talk and then walking with the arrestee away from the area, without holding him or otherwise forcing him to walk, does not appear to be the sort of action reasonably likely to elicit an incriminating response from the arrestee. See id. Likewise, Orozco-Cuellar's statement in response to Blankley's questions that "green" meant marijuana and that the "young one," or Pulido-Tejedo, had told him that the marijuana was in the U-haul was not the product of interrogation. Neither Blankley's question regarding what "green" meant nor his question regarding to whom the marijuana belonged appeared to be intended to elicit an incriminating response. See Innis, 446 U.S. at 301, 100 S.Ct. at 1689. Rather, these questions appear to have been asked for the sole purpose of clarifying Orozco-Cuellar's

11

statements. We agree with our sister circuits on this point. See Rhodes, 779 F.2d at 1032; Gonzales, 121 F.3d at 939; Andersen, 903 F.2d at 532; Butzin, 886 F.2d at 1017-18.

*Bruton*

We review the district court's denial of a motion in limine for abuse of discretion. Cabello v. Fernandez-Larios, 402 F.3d 1148, 1161 (11th Cir. 2005). In Bruton, the Supreme Court held that the Confrontation Clause was violated by the admission of a codefendant's confession that inculpated the defendant at their joint trial, despite a curative instruction given to the jury. 391 U.S. at 126, 88 S.Ct. at 1622-23. We have clarified that Bruton applies to only those inculpatory statements made by a non-testifying codefendant. United States v. Arias, 984 F.2d 1139, 1142 (11th Cir. 1993). The Supreme Court, however, has held that no Bruton problem exists when the statement in question is "not incriminating on its face, and [becomes] so only when linked with evidence later introduced at trial" and has suggested that a non-testifying codefendant's statement may be admitted without violating the Confrontation Clause if it does not directly incriminate the defendant, but the jury must draw inferences to connect the statement to the defendant. Richardson v. Marsh, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987).

12

The district court did not abuse its discretion in denying his motion in limine. See Fernandez-Larios, 402 F.3d at 1161. Orozco-Cuellar's statement that Pulido-Tejedo told him that the U-Haul carried marijuana only directly implicated Orozco-Cuellar and Pulido-Tejedo. It was not incriminating on its face as to Villegas-Tello. See Richardson, 481 U.S. at 208, 107 S.Ct. at 1707. Rather, any incriminatory effect it had as to Villegas-Tello rested on the jury making some inference that, if Pulido-Tejedo told Orozco-Cuellar that the U-Haul carried marijuana, Villegas-Tello also must have known as much. See id..

### B. Sufficiency of the Evidence

We review the sufficiency of the evidence de novo. United States v. Harris, 20 F.3d 445, 452 (11th Cir.1994). In doing so, we review the evidence in the light most favorable to the government and make all reasonable inferences and credibility choices in the government's favor. Id.

> To sustain a verdict of guilt the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, as long as a reasonable factfinder choosing from among reasonable constructions of the evidence could find that the evidence establishes guilt beyond a reasonable doubt.

United States v. Sepulveda, 115 F.3d 882, 888 (11th Cir.1997). Therefore, we will reverse only if no reasonable trier of fact could have found guilt beyond a reasonable doubt. United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004).

13

Also, "[t]he jury [is] free to disbelieve [a defendant's] statements and to take them as substantive evidence to the contrary." United States v. Ellisor, 522 F.3d 1255, 1272 (11th Cir. 2008).

To convict a defendant of conspiracy to possess with intent to distribute drugs, the government must prove that (1) an illegal agreement existed to possess with the intent to distribute marijuana; (2) the defendant knew of the agreement and its "essential nature"; and (3) the defendant knowingly and voluntarily joined the agreement. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). Where the government's proof of these elements is based on circumstantial evidence, "reasonable inferences, and not mere speculation, must support the jury's verdict." Id.

Regarding the knowing participation element, in United States v. Sullivan, 763 F.2d 1215, 1218 (11th Cir. 1985), we held that "[m]ere presence is insufficient to establish knowing participation in a conspiracy, as is mere association with conspirators." (internal citations omitted). In that case, in which the defendant was convicted of conspiracy to possess with intent to distribute marijuana, the evidence against the defendant was as follows. See id. at 1219. Police officers saw the defendant in a hotel parking lot near a red van. A codefendant arrived in a blue van and approached the defendant. They then approached two other men, and the

14

four "walked around the parking lot for about five minutes." The defendant and codefendant then walked to the blue van, removed a small bag, and entered the hotel. A police officer arrested the parties. At the time of the arrest, the defendant was with his codefendant, who was carrying a small bag containing a gun. The police officers also knew that the alleged conspirators were going to the hotel parking lot to meet the men who were meant to distribute the marijuana, but did not know who the drivers were expected to be. Id. We concluded that this evidence was "totally insufficient," as there was no evidence that the defendant knew that the alleged conspirators were planning to transport marijuana or that the blue van would be used to do so or that he knew of the existence of the pistol. Id.

Sufficient evidence supports both Orozco-Cuellar and Villegas-Tello's convictions. See Harris, 20 F.3d at 452. Though the evidence against Orozco-Cuellar and Villegas-Tello is not plentiful, it is not so scant as to suggest that no reasonable jury could have found them guilty beyond a reasonable doubt. See Sepulveda, 115 F.3d at 888; Gunn, 369 F.3d at 1234. The jury did not need to speculate, but could reasonably infer from the evidence that Orozco-Cuellar and Villegas-Tello (1) knew of the conspiracy, as they purchased phones, seemingly together, and traveled to the site where the marijuana was to be retrieved; and (2) voluntarily joined the conspiracy, as Villegas-Tello drove the U-Haul and

15

Orozco-Cuellar participated in the lead car - load car - chase car driving pattern. See Charles, 313 F.3d at 1284. The jury also could have inferred from the facts that the parties used phones and drove in a pattern commonly used by drug dealers and couriers that Villegas-Tello knew he was retrieving marijuana rather than, say, stolen furniture. See id.

Also, although the evidence could support a conclusion of innocence, and Villegas-Tello testified to a specific construction suggesting innocence, the jury was free to reject Villegas-Tello's story and choose the construction suggesting guilt. See Sepulveda, 115 F.3d at 888; Ellisor, 522 F.3d at 1272.

### C. Minor-Role Reduction

We review the district court's finding concerning the defendant's role in the offense for clear error. United States v. DeVaron, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). The defendant bears the burden of proving that he deserves a mitigating-role reduction by a preponderance of the evidence. United States v. Boyd, 291 F.3d 1274, 1277 (11th Cir. 2002).

According to U.S.S.G. § 3B1.2, a district court may decrease a defendant's offense level by two levels if it finds the defendant was a "minor participant" in the criminal activity. A "minor participant" is a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." Id. at

16

comment. (n.5).

We have established a two-pronged approach for determining whether a minor-role reduction is warranted. DeVaron, 175 F.3d at 940. First,"[o]nly if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable-not a minor role in any larger criminal conspiracy-should the district court grant a downward adjustment for minor role in the offense." Id. at 944. We explained that the purpose behind this downward adjustment is to curtail the risk that, "given the relatively broad definition of relevant conduct under [U.S.S.G.] § 1B1.3, some defendants may be held accountable for conduct that is much broader than their specific acts." Id. at 941.

Second,"the district court may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct." Id. at 940, 944. We outlined two limiting principles that control this comparison: "First, the district court should look to other participants only to the extent that they are identifiable or discernable from the evidence. This is a fact-intensive inquiry. Second, the district court may consider only those participants who were involved in the relevant conduct attributed to the defendant." Id. at 944. We also explained that the defendant must be less culpable than most other participants in his relative

17

conduct and recognized the possibility that no participant played a minor role.  Id.

The district court did not clearly err in denying Orozco-Cuellar a minor-role reduction.  See DeVaron, 175 F.3d at 937.  The conduct for which Orozco-Cuellar was held accountable was conspiring to possess with intent to distribute marijuana.  Each of his co-indictees also was held accountable for this conduct.  Regarding the mandatory first prong, the evidence presented  at trial demonstrated that Orozco-Cuellar's role within the conspiracy was helping to transport the marijuana from Atlanta to South Carolina.  See DeVaron, 175 F.3d at 940.  Given that there was no evidence that he was meant to help distribute the marijuana, he may have been held accountable for conduct that was much broader than his actual conduct.  See id. at 941.

However, regarding the second prong, it appears that two of his co-indictees, Villegas-Tello and Pulido-Tejedo, performed the same role as Orozco-Cuellar and the other of his co-indictees, Partida, performed the similarly  limited role of meeting and counting the boxes at the warehouse.  See DeVaron, 175 F.3d at 940, 944.  Given that Orozco-Cuellar performed the same or similar role within the conspiracy as his codefendants, he was not less culpable than most other participants in his relative conduct.  See id. at 944.

**AFFIRMED.**

18