[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13920
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cv-00106-SPM-GRJ

MICHAEL ARRINGTON,

Plaintiff - Counter
Defendant - Appellant,

versus

THOMAS KINSEY,
Detective, in his individual capacity,

Defendant - Appellee,

SADIE DARNELL,
In her official capacity as Sheriff of Alachua County, Florida,

Defendant - Counter
Claimant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 13, 2013)

Before HULL, WILSON and JORDAN, Circuit Judges.

PER CURIAM:

This case arises from the 2007 arrest of Michael Arrington.  In 2011, Arrington filed a five-count complaint in the district court against the Appellees Detective Kinsey and Sheriff Darnell, alleging: (1) a 42 U.S.C. § 1983 false arrest claim against Detective Kinsey; (2) a § 1983 malicious prosecution claim against Detective Kinsey; (3) a § 1983 municipal liability claim against Sheriff Darnell; (4) a state law claim for false imprisonment against Sheriff Darnell; and (5) a state law claim for malicious prosecution against Sheriff Darnell.  Both Appellees subsequently filed motions for summary judgment.  In July 2012, the district court granted summary judgment on all counts, holding that its finding of probable cause foreclosed Arrington's claims.  Arrington now appeals, arguing that the district court erred in granting summary judgment by incorrectly concluding that probable cause existed for his arrest.  Upon review of the record and consideration of the parties' briefs, we affirm.

I.

On July 10, 2007, the Alachua County Sheriff's Office arrested and charged Arrington with the murder of his brother and the attempted murder of his sister-in-law—charges that were later dropped.  At the time of his arrest, Arrington lived in a trailer in rural Newbury, Florida.  His trailer was situated 60 feet from the mobile

2

home shared by his brother, Carl Arrington, and his sister-in-law, Dannette Arrington. At approximately 1:00 a.m. on July 10, 2007, Arrington called 911. He told the dispatcher that he had heard gunshots and had seen someone flee from his brother's home. Two deputies, Butscher and Elliott, arrived at the scene first, followed shortly thereafter by Detectives Kinsey and Kelly, and Sergeant Bernel. When the deputies arrived, they encountered Arrington outside and told him to sit on the ground. Arrington replied, "I don't want to go to prison or jail for this." The deputies then spoke with Dannette Arrington, who accused Arrington of shooting her husband.

Dannette recounted the following: she and Carl were asleep when someone banged on the back door of the trailer. When Carl opened the door, someone shot him. Dannette then ran into the bedroom and sat against the door to prevent the shooter from getting in the room. The shooter attempted to pry the door open and managed to wedge his hand in enough to fire several shots. He then left. As the shooter retreated, Dannette heard the distinct sound of the cane that Arrington uses to walk. She stated that the shooter had blonde hair, and wore a long grey shirt and blue jeans. She also informed the officers that Arrington and Carl had a historically hostile relationship. Dannette told the deputies that she believed Arrington was mentally unstable.

3

Dannette's description of the shooter matched Arrington's physical appearance. Arrington also had abrasions on his fingers consistent with someone who had attempted to pry open a door. At the scene, Detective Kinsey noted that Arrington was walking with two canes. Deputy Butscher observed a red spot on Arrington's shoe that appeared to be blood. Arrington consented to a search of his home and agreed to have his hands swabbed for a gunshot-residue analysis. Officers discovered marijuana, several firearms, and ammunition inside of Arrington's home, but none of these firearms appeared to be the weapon used to kill Carl Arrington. While searching Arrington's home, Detective Kelly stood in the spot where Arrington claimed to have been standing when he saw the shooter flee his brother's trailer. Kelly concluded that Arrington could not have seen the shooter flee because shrubbery blocked the view. Arrington did, however, show Detective Kelly his phone log to support his claim that he when he heard the gunshots, he first unsuccessfully attempted to call his brother and then called 911. The deputies also deployed a police dog to the scene, but it did not "hit" on Arrington.

Arrington was subsequently placed under arrest for the possession of marijuana and the possession of firearms by a convicted felon and transported to the Alachua County Sheriff's office to be interviewed. Detectives Kinsey and Kelly conducted the interview of Arrington until he requested counsel. During this

4

time, Sergeant Bernal obtained the State Attorney Office's approval for an on-view arrest of Arrington for murder and attempted murder. Sergeant Bernal and Detective Kelly both believed that there was probable cause to arrest Arrington for murder and attempted murder. Although Detective Kinsey did not believe that there was probable cause for the charges of murder and attempted murder, he was the officer who prepared the arrest reports on all charges.

On September 7, 2007, a judge in the Eighth Judicial Circuit of Florida held that there was no probable cause to hold Arrington on the charge of murder or attempted murder and ordered his release. Arrington pleaded guilty to possession of marijuana and possession of firearms by a convicted felon. Arrington now appeals the district court's grant of Appellees' motions for summary judgment.

## II.

We review de novo a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court. *Edwards v. Shanley*, 666 F.3d 1289, 1292 (11th Cir. 2012). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e are required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Skop v. City of Atlanta*, 485 F.3d

5

1130, 1143 (11th Cir. 2007) (internal quotation marks omitted). Arrington has the burden of demonstrating the absence of probable cause in order to succeed on his § 1983 claims, while Appellees have the burden of demonstrating the existence of probable cause as a defense to the state claims. *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998).

### III.

"[A]n individual has a right to be free from unreasonable searches and seizures." *See Skop*, 485 F.3d at 1137 (internal quotation marks omitted). If probable cause for arrest exists, however, then the individual has no claim for false arrest under § 1983, *see id.*, or Florida state law, *see Lewis v. Morgan*, 79 So. 3d 926, 928–29 (Fla. Dist. Ct. App. 2012). The existence of probable cause also constitutes an absolute bar to claims for both federal and Florida state claims of malicious prosecution. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). Finally, for a municipal liability claim to be successful against an officer, that officer must have inflicted constitutional harm. *See Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009). If there was probable cause for arrest, then there was no constitutional violation and no municipal liability. *See id.*

Probable cause to arrest exists when a police officer has a reasonable belief that a suspect has committed or was committing a crime, based upon facts and circumstances within his knowledge. *United States v. Gonzalez*, 969 F.2d 999,

6

1002 (11th Cir. 1992).  The reasonableness of this belief is objective and based on the totality of the circumstances.  *See Kingsland*, 382 F.3d at 1226.  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id*. (internal quotation marks omitted).  "[T]he observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances . . . ."  *Gonzalez*, 969 F.2d at 1003.

"[O]bjectively, officers should not be permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon."  *Kingsland*, 382 F.3d at 1228.  An officer, however, is generally entitled to give weight to the victim's criminal complaint and identification as support for probable cause.  *See Rankin*, 133 F.3d at 1440; *L.S.T., Inc. v. Crow*, 49 F.3d 679, 684–85 (11th Cir. 1995) (per curiam).  In determining whether probable cause exists, "we deal with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Rankin*, 133 F.3d at 1435 (alterations and omission in original) (internal quotation marks omitted).

7

"If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed." *Case*, 555 F.3d at 1327. An "officer may still be shielded from liability because his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. (internal quotation marks omitted). We afford "great deference to a lower court's determination that the totality of the circumstances supported a finding of probable cause." *United States v. Steiger*, 318 F.3d 1039, 1046 (11th Cir. 2003) (internal quotation marks omitted).

Here, because the existence of probable cause would defeat all of Arrington's claims, we focus our analysis accordingly. As a preliminary matter, Arrington's claim of false arrest is baseless. "[S]ubjective reliance on an offense for which no probable cause exists" does not make an arrest out of order where there is probable cause to arrest for a different offense. *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) (internal quotation marks omitted). In this case, the charges of possession of marijuana and possession of firearms by a convicted felon gave Detective Kinsey probable cause to arrest Arrington. *See Devenpeck v. Alford*, 543 U.S. 146, 155, 125 S. Ct. 588, 595 (2004).

Arrington contends that the district court failed to view the evidence in the light most favorable to him, that there was insufficient evidence at the time of arrest, and that the totality of the circumstances shows that there was no probable

8

cause.  Arrington specifically argues that the evidence at the scene contradicts Dannette Arrington's identification of him as the shooter and that the officers therefore conducted an unreasonable investigation.  We disagree.

Arrington first claims that because the district court improperly gave credence to Detective Kelly's observation that Arrington could not have seen the shooter flee, the district court did not view the facts in the light most favorable to him.  The district court, however, correctly held that even without that information, there was still probable cause to arrest Arrington.  Moreover, this was an observation of an officer taken as part of the totality of the circumstances, and therefore one that the district court properly weighed it in its probable cause analysis.  *See Gonzalez*, 969 F.2d at 1003.

Next, Arrington argues that the guns and ammunition found in his home were unrelated to the type used to shoot Carl Arrington, and that the deputies should have waited for the results of the gunshot-residue analysis to come back before charging him.  While it is true that an officer "should not be permitted to turn a blind eye to exculpatory information that is available to them," *Kingsland*, 382 F.3d at 1228, there is no requirement that officers await the results of a residue test.  Specifically, because the officers conducted a reasonable investigation and there was sufficient evidence to support a finding of probable cause, it was not necessary to delay the arrest for the results of a test that were not readily attainable.

9

Arrington further contends that his statement about "not wanting to go to prison or jail for this" is exculpatory, rather than an admission of wrongdoing. Arrington maintains that because of his visible physical condition, he was clearly unable to commit the crime. He also argues that the district court incorrectly stated that there was a previous altercation between the two men where Dannette Arrington called the police because Appellant was going to "beat up" Carl Arrington. He claims that Carl Arrington had in fact threatened him. Finally, Arrington contends that Dannette's statement to the officers was unreliable and impossible.

Dropped charges provide an occasion to puncture, through retrospection, the onerous on-scene judgments of an officer. The ultimate release of charges, however, is of no significance in the probable cause analysis. *See Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990). Officers are not expected to be legal technicians. *See Rankin*, 133 F.3d at 1435. An officer "need not take every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person." *Id.* at 1436 (omission in original) (internal quotation marks omitted).

This was a murder scene. Upon arrival, Arrington was outside, with a splash of red "blood" on his shoe, abrasions on his hand consistent with what might have been injuries from the break-in, and he immediately stated: "I don't want to go to

10

prison or jail for this."  The victim's wife described the incident in detail and identified Arrington as the shooter.  Her description of the intruder was consistent with Arrington's physical appearance.  Dannette also told the officers that she believed Arrington to be mentally unstable.  The victim and Arrington had a historically volatile relationship, including a call to 911 on a previous occasion. This earlier incident of hostility factors into the probable cause analysis, regardless of who had previously threatened whom.

Further, Detective Kinsey relied on the deputies' trustworthy account of what occurred prior to his arrival at the scene and conducted his own reasonable investigation.  As the district court correctly determined, Detective Kinsey's subjective belief plays no role in the probable cause analysis.  *See id*. at 1433. Appellees were "entitled to rely to a meaningful degree" on Dannette's statement "in determining the existence of probable cause."  *Id*. at 1440.  These statements alone, however, did not constitute the only evidence suggesting that Arrington had committed the crime.  A reasonable officer could have believed that Arrington's arrest for murder and attempted murder was objectively reasonable based on the totality of the circumstances.  *See id*. at 1435.  We determine that probable cause existed and consequently defeats Arrington's federal and state claims.  And, because we find probable cause, we need not address whether the defendants lacked arguable probable cause.  *Case*, 555 F.3d at 1328.

While it is unfortunate that Arrington was arrested on charges that were later dropped, we find no error in the district court's grant of summary judgment. Accordingly, we affirm the district court's order.

**AFFIRMED.**